**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Michael BIANCOFIORI, Defendant-
Appellant.**

**No. 17655.**

United States Court of Appeals,
Seventh Circuit.

Feb. 2, 1970.

Certiorari Denied June 1, 1970.
See 90 S.Ct. 1857.

Julius Lucius Echeles, Chicago, Ill., for defendant-appellant.

Thomas A. Foran, U. S. Atty., Alan L. Adlestein, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee; Jill Wine Volner, Atty., Dept. of Justice, John Peter Lulinski, Michael B. Nash, Asst. U. S. Attys., of counsel.

Before DUFFY and HASTINGS, Senior Circuit Judges, and KERNER, Circuit Judge.

DUFFY, Senior Circuit Judge.

Defendant was charged in a one-count indictment with the violation of 18 U.S.C. § 894.[1]

The indictment charged that from September 1, 1968, through October 8, 1968, defendant knowingly participated in the use of extortionate means to collect and attempt to collect, extensions of credit from George Wright, and to punish him for the non-payment of those extensions of credit.

A jury was waived and a motion for acquittal was denied. The Court found the defendant guilty as charged.

The witnesses at the trial were George Wright, the victim, and his wife, and four special agents of the Federal Bureau of Investigation. The defendant testified in his own behalf. The evidence established that from October 1967 to March 1968, defendant made a series of four unsecured personal loans to George Wright, with interest of 7% a week. It was made clear to Wright that the defendant was an agent for a criminal organization, and that if Wright did not make his weekly interest payments and did not repay the principal of the loan, he might be physically harmed by

1. Section 894, Title 18 U.S.Code, captioned "Collection of extensions of credit by extortionate means" became effective on May 29, 1968, and is one of the six sec-

tions of Title II of the Consumer Credit Protection Act, which Title deals with extortionate credit transactions.

that organization or by the defendant himself.

In February 1968, after Wright had made payments to defendant of both principal and interest, they entered into a partnership in a painting and decorating business. Defendant controlled the finances of the business and took company funds for payments that were due him from Wright. However, in August 1968, business relations were severed and Wright refused to make further weekly payments. Defendant then made threats to Wright during September and October 1968.

In August 1968, defendant approached Wright in a parking lot and asked "What are you going to do about your juice payments?" In mid-September 1968, Wright was visited at his apartment by the defendant who again asked Wright what he was going to do about his juice payments. Wright answered he was not going to do anything. Defendant then stated "How would you like for me to turn it over to the boys. They will take real good care of you." Defendant later that day telephoned Wright stating "Well, you know, if I turn it over to the boys, they are going to hurt you pretty good." Shortly thereafter Wright contacted the Chief of Police of Rosemont and the FBI. A final attempt was made by defendant to make a collection from Wright in the latter's apartment in Schiller Park on October 8, 1968. The threats on that occasion were witnessed and overheard by two Special Agents of the FBI.

On this appeal, defendant stresses that the loans were made by defendant before 18 U.S.C. § 894 became effective. This is entirely irrelevant. It is the use of extortion in the course of loan *collections* which is the conduct made unlawful by the statute to which we have referred (18 U.S.C. § 894).

When defendant threatened George Wright in August 1968; when, by means of a raised fist, in mid-September 1968 defendant threatened Wright in his apartment in the presence of his wife; when defendant thereafter threatened Wright and his wife on the telephone and when defendant made a final collection from Wright in October 1968 in the hidden presence of two FBI agents and told Wright that more payments would keep the boys off Wright's back and halt the threatening telephone calls from Big Al; these instances which were all established by the evidence, are sufficient to sustain the charges made in the indictment. The statute, 18 U.S.C. § 894 states "(a) Whoever knowingly participates in any way, * * * in the use of any extortionate means (1) to collect or attempt to collect any extension of credit, or (2) to punish any person for the nonrepayment thereof, * * *."

Defendant insists that the statute under which defendant was convicted is unconstitutional; that for Congress to have power to act in this field, the crime must be of an interstate character. He cites Linder v. United States, 268 U.S. 5, 17, 45 S.Ct. 446, 449, 69 L.Ed. 819 (1924) that "Congress cannot, under the pretext of executing delegated power, pass laws for the accomplishment of objects not entrusted to the Federal Government."

Defendant insists that the statute under which he was prosecuted is not involved with an activity "that affects commerce." Defendant also argues that in his activities, he did not use any interstate facilities.

Defendant ignores many of the more recent cases interpreting the commerce clause and which clearly demonstrate that Congress can regulate what might be considered local activities, if those activities in any substantial way affect interstate commerce. See Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017 (1968); Katzenbach v. McClung, 379 U. S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); White v. United States, 395 F. 2d 5 (1 Cir., 1968), cert. den. 393 U.S. 928, 89 S.Ct. 260, 21 L.Ed.2d 266 (1968); White v. United States, 399 F. 2d 813 (8 Cir., 1968).

In Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258, 85 S. Ct. 348, 358, 13 L.Ed.2d 258 (1964), the

Supreme Court stated: "It is said that the * * * [activity regulated by the statute involved herein] is of a purely local character. But, assuming this to be true, '[i]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze. * * *' United States v. Women's Sportswear Mfrs. Assn., 336 U.S. 460, 464, 69 S.Ct. 714, 93 L.Ed. 805 (1949).

■ "Thus the power of Congress to promote interstate commerce also includes the power to regulate the local incidents * * * which might have a substantial and harmful effect upon that commerce. * * *"

Also pertinent are findings which were made by Congress: "(1) Organized crime is interstate and international in character * * * (2) A substantial part of the income of organized crime is generated by extortionate credit transactions * * * (3) Extortionate credit transactions are carried on to a substantial extent in interstate and foreign commerce and through the means and instrumentalities of such commerce. Even where extortionate credit transactions are purely intrastate in character, they nevertheless directly affect interstate and foreign commerce." Consumer Credit Protection Act, Title II, Sections 201(a) (1) and (3) [82 Stat. 159].

It has been held that such Congressional findings must be accorded considerable weight in determining the constitutionality of the statute involved. Katzenbach v. McClung, *supra*, 379 U.S. at p. 303, 85 S.Ct. 377.

The view of the United States Supreme Court is well stated in Katzenbach v. McClung, *supra*, 379 U.S. at pp. 303–304, 85 S.Ct. at p. 383: "Of course, the mere fact that Congress has said when particular activity shall be deemed to affect commerce does not preclude further examination by this Court. But where we find that the legislators, in light of the facts and testimony before them, have a rational basis for finding a

chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end."

The Congress did not rely on general knowledge alone in making the findings that local loan sharks' activities affected interstate commerce and should be regulated. The Conference Report, H.R. Conference Report No. 1397, 90th Cong., 2d Session 28 (1968) [1968 U.S.Code Cong. and Adm.News, p. 2026] stated: "* * * [t]here is ample evidence that such [extortionate credit] transactions are carried on on a large scale and that they have a substantial impact on interstate commerce."

Furthermore, the statute dealing with collection of extensions of credit by extortionate means can be sustained as falling within Congress' power to make uniform laws concerning bankruptcy. Congress found: "Extortionate credit transactions directly impair the effectiveness and frustrate the purposes of the laws enacted by the Congress on the subject of bankruptcies." Consumer Credit Protection Act, Title II, Sec. 201(a) (4) [82 Stat. 159].

The Congress also noted "* * * It is obvious, however, that obligations as to which there is an understanding that they may be collected by extortionate means, or which are actually so collected, are not susceptible of being 'discharged' in bankruptcy in any meaningful sense. * * *" H.R. Conference Report No. 1397, 90th Cong., 2d Session 28 (1968) [1968 U.S.Code Cong. and Adm.News, pp. 2025, 2026].

■■ We hold the regulation of extortionate credit transactions is and was within Congress' power; that Title II of the Consumer Credit Protection Act, including the section under which defendant was indicted and convicted, are constitutional; that 18 U.S.C. § 894 was properly applied to the acts performed by defendant during September 1, 1968 to October 8, 1968.

Judgment affirmed.